COMMODITY FUTURES TRADING COMMISSION Plaintiff

v.

RISK CAPITAL TRADING GROUP, INC., Deron Baugh, Tyrone Edwards, Stephen Margol, Rick Siegel, Richard Tillman, and Juan Valentin Defendants

No. 1:03CV2633 ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 14, 2006.

---

Kathleen M. Banar, Richard Glaser, Daniel C. Jordan, Frank Rangoussis, William L. Small, Anne Termine, Richard B. Wagner, Commodities Futures Trading, Commission, Washington, D.C., Sharon Douglas Stokes, Laura Kennedy Bonander, U.S. Attorney's Office, Northern District of Georgia, Atlanta, GA, for Plaintiff's Attorneys.

Peter J. Anderson, Keith Jerrod Barnett, Lawrence A. Danny, III, Jennifer M. Moore, Sutherland Asbill & Brennan, Atlanta, GA, for Defendant Rick Siegel.

*ORDER*

EVANS, District Judge.

This civil enforcement action brought under the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1 *et seq.,* is currently before the Court for findings of fact and conclusions of law as to Plaintiff's claims against Defendant Rick Siegel ("Siegel") following a bench trial on June 12–15, 2006.[1]

Plaintiff Commodity Futures Trading Commission ("Plaintiff" or "CFTC") is the independent federal regulatory agency charged with the administration and enforcement of the Act and the regulations promulgated thereunder, 17 C.F.R. § 1.1 *et seq.* Plaintiff alleges that Siegel, in his capacity as an Associated Person ("AP")[2] of Risk Capital Trading Group, Inc. ("Risk

---

1. All claims against other Defendants have been settled. Defendants Risk Capital Trading Group, Inc., Baugh, Edwards, Margol, and Valentin settled just before trial. Defendant Tillman was in jail and was unable to attend the trial. He settled soon after the trial.

2. In the commodity industry, "associated person" is the term commonly used for a person who is essentially a broker.

Capital"), violated the anti-fraud provisions of the Act, specifically 7 U.S.C. § 6b(a)(2)(i) and (iii), 7 U.S.C. § 6c(b), and 17 C.F.R. § 33.10, in soliciting customers to buy and sell commodity futures contracts and options on commodity futures contracts. Plaintiff claims that Siegel caused his customers to invest money under a false impression of the probability of large profits. Almost all of Siegel's customers lost all or substantial portions of their investments.

Plaintiff seeks a permanent injunction, restraining Siegel from further violating the Act and also from engaging in any commodity-related sales activity.

Plaintiff seeks restitution in the following amounts for the four former customers of Siegel who testified at trial: Etienne Brown—$2,985.12; Michael Maiorino—$ 9,432; Sandra Brothers—$8,301.92; and Dean Wiegand—$2,892.41. Plaintiff also seeks restitution for all of Siegel's other customers in the amount of $990,492.55.

Plaintiff seeks disgorgement of Siegel's compensation derived from his customers in the amount of $102,417.

Finally, Plaintiff seeks civil monetary penalties in the maximum amount allowed under the Act of $120,000 for each violation of the Act.

Having heard the evidence and arguments presented by the parties and having reviewed their briefs which have been filed, the Court makes the following findings of fact and conclusions of law:

**I. Findings of Fact**

Beginning in January 2001, Risk Capital operated as an "introducing broker,"[3] soliciting orders for options and futures contracts. Its primary place of business was in Atlanta, Georgia. Risk Capital sold predominantly commodity options to small retail customers whose business was sought through "cold call" telemarketing. Risk Capital closed in September 2003, following an investigation and Complaint by the National Futures Association ("NFA"), an investigation by the CFTC, and the filing of the instant lawsuit.

The trial evidence showed that Risk Capital was a scam: Its principals had been involved in other similar schemes. By using aggressive sales techniques and false and misleading representations with clients who were gullible and vulnerable, Risk Capital induced the clients to pay commissions (often on a repeat basis) for speculative investments which had no real chance of success.

From 2002 to 2003 Risk Capital took in approximately $7,300,000 in commissions in $200 and $100 increments. It had over 1,000 customers who collectively lost over $11,000,000. Approximately 97% of Risk Capital's customers lost money—exceeding the 85% loss rate which has been estimated for the small investor commodity industry as a whole.

Risk Capital's customers usually purchased "call" options.[4] The owner of a call

---

**3.** An introducing broker cannot hold clients' money. This requires an association with a Futures Commission Merchant. 7 U.S.C. § 1a(23). Risk Capital had an association which fulfilled that function.

**4.** The purchaser of a call option is betting that the price of the underlying futures market will rise. If the futures market rises above the strike price of the option, the option is said to be "in the money." This means that the

holder of the option has the right to purchase the subject futures contract at a price *below* that for which it can be purchased in the market. If the commodity futures market price is the same as the strike price of the option, the option is said to be "at the money." If the commodity futures market price is below the strike price of the option, the option is said to be "out of the money."

option on a futures contract has the right to purchase the underlying futures contract at a specified price ("strike price") at any time before a specified date in the future. Risk Capital sold primarily so-called "deep out of the money" call options. These options are cheap in relation to other options because the strike price is so far above the futures market price (when the option is purchased) that it is highly unlikely that the futures market price will ever reach the strike price. In the highly unlikely event that the market rises above the strike price, the option holder can make a large leveraged profit. Otherwise a modest profit can be made by selling the option on the secondary options market if and when the market price for the option has risen above the price originally paid by the client. Of course, the client's breakeven point includes not only the price of the option (called the "premium") but also commissions and NFA fees.[5]

The movement of the commodity options market is unpredictable and can be volatile. Capturing a profit (or minimizing a loss) through sale of the option requires close, continuous attention to the market and an element of luck in effecting the sale before the market worsens. Sale of an option at a loss may be the best course of action. The passage of time (moving toward the expiration date) tends to degrade the option's value. When an out-of-the-money option expires, it is worthless and the customer will have lost his total investment (the price of the option plus commissions and NFA fees).

Occasionally Risk Capital's clients would purchase commodity futures contracts. A commodity futures contract is a contract to buy (or sell) a standard quantity of a particular commodity at a specified price and time in the future. The owner of a futures contract is exposed to risk far beyond the purchase price of the futures contract. If he still owns the contract at maturity, he would be forced to purchase (or sell) the specific commodity at the price set in the contract or to meet his obligation through alternative means.[6]

Risk Capital purchased names and telephone numbers of potential customers. Its representatives would make cold calls to these prospects, often using misleading sales scripts. The cold caller would fill out a prospect information sheet which would describe the call. If the prospect showed some interest, the cold caller would send Risk Capital's "Risk Disclosure Packet" and the prospect information sheet would be turned over to an account executive (such as Siegel) who would make a follow-up sales call. If an account was opened, the account executive would make the first options purchase. The account would then be turned over to a "trading advisor" who determined when the option should be sold and who would pitch another investment. Risk Capital had four trading advisors. Because 97% of Risk Capital's clients lost money, the Court infers that either the trading advisors did not adequately follow

---

**5.** Where the transactional costs are equal to one-quarter of the premium—a typical scenario for Risk Capital clients—the premium must rise more than 25% in a few months to yield a profit when the option is sold.

**6.** Two types of investors purchase commodity futures contracts: hedgers and speculators. Hedgers buy futures contracts to minimize (or transfer) risk and to lock in a price certain for the underlying commodity; speculators buy

futures contracts to take on risk in the hopes of realizing capital gains on their investment. Risk Capital's clients were all speculators. For obvious reasons, speculators (especially retail investors such as Risk Capital's customers) typically do not hold commodity futures contracts to maturity; speculators purchase futures contracts to make a profit, not to take actual delivery of a large quantity of commodities.

the movement of the options market or that the market rarely moved above the clients' break-even point within the option period, or both.

While Risk Capital utilized written risk disclosures signed by clients,[7] as well as recorded client interviews to document clients' appreciation of the high risk in commodities trading, it also undertook to offset the cautionary effect of these warnings. One such measure was the aggressive, overly optimistic verbal sales pitch of the account executive seeking to open the account. Another was the routine coaching of prospective customers that the risk disclosure form and recorded interview had to be done a certain way—otherwise, they would not be allowed to open an account. Clients were told that they should state a certain level of income and level of assets (whether true or not) and that when asked if anyone had coached them on what to say in the recorded interview they should say "no."

Prior to joining Risk Capital, Siegel was a "market maker" on the floor of the Chicago Board of Trade for twenty years. He owned a seat on the Board of Trade. Siegel mainly traded in the bond futures market but also traded in a wide variety of commodity futures. He traded for his own account and made significant profits in all years except the last one. Prior to the initiation of this lawsuit, Siegel never was the subject of an enforcement action.

After leaving the Chicago Board of Trade, Siegel took some time off before joining Risk Capital on February 19, 2002. He was employed in the Atlanta office as an AP. Siegel's title was Account Executive. He rarely made cold calls. His primary function was to persuade customers to open accounts and to send in the initial

deposit for trading. He was a persuasive salesman. Once the account was opened, Siegel would make the first options purchase for a new customer. When a customer was considering purchasing a commodity futures contract (as opposed to an option), Siegel would handle that transaction. He was Risk Capital's only AP who was allowed to handle futures contracts.

Siegel shared an office with Mark Chambers, who was his assistant. Chambers did Siegel's paperwork. This included checking to make sure that new clients had filled out the risk disclosure forms in the "right" way—that is, to meet minimum financial requirements and to verify an understanding of the risks of trading, and to verify that no one had coached them. When the forms were not filled out in the manner which permitted the account to be opened, Chambers would call and give instructions to the client. The Court infers that Siegel overheard these telephone calls.

Risk Capital's account executives and trading advisors were commission-paid. Each options purchase involved a $200 commission. Each futures contract purchase called for a $100 commission. The commission was split among Risk Capital (60%) and also among all persons who had advised the client, including the account executive who had opened the account and the trading advisor. Siegel was entitled to consideration for bonuses, and Risk Capital paid his apartment rent. Siegel's income from Risk Capital was primarily tied to his success in getting clients to open accounts and send in their money.

Siegel spent his first three days at Risk Capital observing and listening to other APs converse with prospective and current

---

7. The disclosures were in a packet of materials sent after a "cold call" in which the customer indicated possible interest. These materials are reproduced as an Appendix to this Order.

clients. He was troubled by some of the leveraging examples he heard other APs providing to customers. He observed some of the APs using sales scripts. After that he began to open accounts. Siegel did not use sales scripts to solicit customers or to discuss trades with them. Siegel did tell potential customers that options and futures trading was risky, but he also emphasized his considerable past experience plus the fact that he personally had been successful financially in the commodities field. He encouraged his customers to trust in his judgment and rely on his expertise, downplaying the need to be concerned with the extensive warnings in the written materials they had received from Risk Capital.

While Siegel's representation that he had considerable experience trading futures contracts and options was literally true, trading on the floor of the Chicago Board of Trade was far different from working in Risk Capital's retail sales office. Most importantly, at Risk Capital he did not have access to up-to-the-minute new information as he had had on the floor of the Chicago Board of Trade. Also, neither Siegel nor the trading advisors could effect trades as quickly as at the Board of Trade. According to testimony at trial, which the Court credits, the commodity futures market very quickly factors new information into prices. Thereafter, the information has no relevance to later movement of the market. The Court is doubtful that Risk Capital's APs had any special information or insights which were helpful in trading options on futures contracts.

In explaining commodity trading to prospective clients, Siegel used the "delta" concept [8] to explain that the upward movement of futures contract prices can result in large leveraged increases in the value of an option to purchase the contract. It is correct that such increases can occur. However, because most of Risk Capital's customers purchased deep out-of-the-money options (the cheapest options and the least likely to result in a large profit), the "delta" formula had little practical application; [9] it served only to add a formulaic patina to what was really more like buying a lottery ticket.

After Siegel had made the first options purchase for a client, he would tell the client that the account had been turned over to one of four "trading advisors" who would advise the client as to when to sell the option. These sales normally caused losses, triggering complaints from clients who had been expecting profits based on Siegel's projections. The clients would often contact Siegel again for an explanation or to seek advice.

The Court also infers and finds that after Siegel had worked at Risk Capital for a period of time, he gained an actual awareness that almost all of the customers were losing their investments, including those whose accounts he had opened. Certainly, that must have been true by the fall of 2002. Siegel knew because clients called him with complaints about the trading advisors. The trading advisors' track records, which were disastrous, are set

---

8. Delta expresses a theoretical relationship between a futures contract price and the value of an option to purchase the futures contract. Siegel's clients probably thought, incorrectly, that whenever the commodity price went up (*e.g.,* heating oil in the winter), the value of their option would increase by a multiple of the commodity's increase. Siegel did understand the distinction between the commodity price and the commodity futures contract price and undoubtedly knew that his clients were confused.

9. In the case of a deep out-of-the-money-option, delta approaches zero.

forth in Plaintiff's Exhibits 97 and 101. Nonetheless, he continued with prospective clients to emphasize his own expertise and the fact that he had had financial success with commodity trading despite its risky nature. This was deceptive because the trading advisors, who he knew would be making the decision as to when to sell the option, regularly sold at a loss.

At trial, Plaintiff called four previous customers of Risk Capital to testify about their dealings with Risk Capital and Siegel.

### 1. *Etienne Brown*

Etienne Brown ("Brown") had limited investment experience in stocks and mutual funds. He had no experience in commodities markets and no understanding of how those markets worked.

Brown testified that he was cold called by Siegel in May or June 2002. According to the prospect information sheet memorializing this phone call, however, Jason McGill was the cold caller. The Court finds that Brown was mistaken about the identity of his cold caller. The prospect information sheet is dated May 14, 2002 and has McGill's name on it. The Court accepts Siegel's testimony that the handwriting on the sheet was not his. Def.'s Ex. 39 (RS–00173). McGill and Brown discussed the unleaded gasoline market but Brown did not agree to invest at this time. He requested additional information.

After Brown received a packet of materials Siegel called Brown. They developed a good rapport. Brown was impressed by Siegel's experience in and knowledge of the commodities market.

Brown opened an account at Risk Capital, depositing a total of $5,450. Siegel was the account executive. Siegel said that there were opportunities in the soybean market. Brown could not recall the exact reasons Siegel gave for why the soybean market was attractive, but he said that the reasons had something to do with drought, harvest shortages, and pestilence in certain areas that would cause supply to be depressed. Brown purchased 5 soybean call options on or around May 13, 2002 for $5,450, of which the premium was $4,250, the commissions were $1,000, and the NFA fees were $200. The trade ticket for this investment is dated May 31, 2002 and bears the initials "RS/JMC," meaning that Siegel earned the primary commission on the trade and McGill earned a residual commission for making the cold call.

After this first purchase, Brown's account was transferred to Deron Baugh, a trading advisor at Risk Capital. Baugh recommended that Brown sell his soybean call options, which were showing a profit, and invest in 8 call options on Euro futures. Brown agreed to the proposed investment and the trade was placed on or around June 28, 2002. The premium for the 8 Euro options was $4,800, and Brown paid $1,600 in commissions and $320 in fees. Brown was notified that he owed an additional $470 to cover the cost of the trade, which he refused to pay. Brown did not like Baugh and the trade which Baugh recommended lost money. Ultimately, the 50% stop loss placed on the Euro investment was triggered and Brown's account value was $1,690, reflecting a decline of $3,110 or 64.8%.

Brown submitted a complaint to the NFA on July 22, 2002 concerning his dealings with Baugh. Ultimately, Risk Capital agreed to refund the amount lost in Brown's account on the condition that he continue to invest with Risk Capital. Brown agreed and signed a release form. He requested that his account be transferred back to Siegel because he was com-

fortable with him and they had a good rapport.

Siegel did not charge Brown commissions on further trades. He recommended that Brown purchase call options on wheat futures, citing reasons similar to the ones he gave for investing in soybeans. Per Siegel's advice, Brown purchased three call options on wheat futures on or around September 10, 2002. Siegel placed a 50% stop-loss order on this trade. Brown testified that he was under the impression that this meant that he could lose no more than half of his investment. The Court finds that while Brown may have been under this impression during the trade with Baugh, by the time of his final trade with Siegel, he knew that the 50% stop-loss did not guarantee that losses would be limited to 50% of the investment. The details of this final investment are unclear, but apparently it fared poorly.

Brown closed his account and received a check for approximately $836. He did not file a complaint with the NFA against Siegel.

### 2. Michael Maiorino

Michael Maiorino testified that Siegel cold-called him and discussed trading options on commodity futures. Maiorino testified that Siegel stated that he was a successful AP; that the heating oil futures market was promising because the winter months were approaching and the demand for heating oil would increase; that small moves in the price of the heating oil futures market would yield large profits for investors; and that Maiorino could make 4 or 5 times his investment if he invested soon.

Siegel testified that he did not place the cold call to Maiorino and that he had not been the Account Executive. Mikeal Masterson cold called Maiorino and another Account Executive, Jack Sini ("Sini"), was

the account executive. Siegel stated that Maiorino and Sini were arguing over whether Maiorino could buy an option with a different strike price than the one Sini was attempting to sell him. Sini asked Siegel to discuss this matter with Maiorino. Siegel testified that he had a two-minute conversation with Maiorino, after which Sini placed the order that Maiorino desired.

The Court finds Siegel's version of the story more credible because it is supported by objective evidence, and because it was clear that Maiorino's memory of the events in question was lacking. First, the prospect information sheet confirms that Masterson did call Maiorino on December 3, 2002. Additionally, Maiorino's trade tickets are not in Siegel's handwriting. Siegel's initials do not appear in the box in which the initials of Maiorino's primary APs appear. Siegel's initials do appear outside of the box because of Risk Capital's policy that any AP who talked to a client (even if only for a short period of time) would receive a portion of the commissions generated on the account. The objective evidence shows that after the initial trade was placed the account was transferred to David Mittler, a trading advisor.

Thus, the Court finds that with respect to Maiorino, Siegel had only a brief conversation that did not involve any misrepresentations.

### 3. Dean Wiegand

Prior to investing with Risk Capital, Dean Wiegand, a farmer in Canada, had no investment experience. It was clear at trial that he had no understanding of the commodities market.

In March 2002, Wiegand was called by Desmond Muthemba, an AP at Risk Capital. Muthemba told Wiegand that peak

driving season was approaching and that crude oil was a good investment. Muthemba stated that other investors had doubled and tripled their money in that market and the faster Wiegand invested the better. Wiegand agreed to invest money with Muthemba. Muthemba faxed the account opening documents to Wiegand. Wiegand did not read the documents; he just signed them, faxed them back to Muthemba, and wired approximately $3,000 on March 22, 2002. That same day, Muthemba placed an order to purchase three option contracts on unleaded gasoline futures.

Some time later, Wiegand received a phone call from Siegel, who told Wiegand that he had lost $2,000 and that only $1,000 remained. Siegel stated he was optimistic about making the money back with the remaining $1,000. He told Wiegand that he would call back when an investment opportunity arose.

Approximately one week later, Siegel called Wiegand and told him that the gasoline futures market was an attractive investment. Wiegand testified that Siegel told him that there was an announcement coming out and that if the announcement was favorable, Wiegand could make money. Wiegand said that he "had to go with [Siegel's] knowledge instead of his." The trade was placed on April 17, 2002. Shortly thereafter, Siegel called Wiegand and informed him that the investment had been sold at a loss.

Wiegand closed his account and received a check from Risk Capital in the amount of $107.59.

### 4. Sandra Brothers

Sandra Brothers' memory of the events in question was lacking, and the Court questions the credibility of some of her testimony. However, Plaintiff presented notes of conversations with Siegel that Brothers had made contemporaneously with the conversations, as well as other objective evidence that corroborated some parts of her testimony.

From 2002 to 2003, Brothers was a sales representative at a department store in Georgia. According to her testimony, she had between $100,000 to $150,000 invested in mutual funds for retirement. She read money and investment magazines on occasion. Her only experience with investing was with mutual funds.

On September 24, 2002, she received an unsolicited phone call from Muthemba at Risk Capital. Brothers' testimony concerning the call contradicts the prospect information sheet that Muthemba completed during their conversation. According to the prospect information sheet (which the Court finds to be more credible), Brothers indicated some interest in investing in commodity futures and options. Muthemba wrote:

> Went through a 9¢ [heating oil] move, loves it, has [illegible] interested & looking for this opportunity, wants to feel [illegible] informed on the in/outs. Close, Close, Close.—(Very open [illegible] Gone through calls & puts).

Siegel called Brothers that evening. She jotted down notes of this and subsequent conversations between them, which were admitted at trial. Siegel told Brothers about his credentials and that he had been among the best at the Chicago Board of Trade. He did acknowledge that there was risk, but he also implied that he could navigate around the risk using his knowledge of the commodity futures and options markets. Brothers' notes state "Rick said to 'Risk a little to make a lot.'" Pl.'s Tr. Ex. 629.

Brothers received the packet from Risk Capital which was sent via Federal Express. She attempted to read the docu-

ments but did not understand them. Siegel told her not to worry because he had the knowledge. He discussed heating oil futures, which he said was a promising market because of the possibility of a war with Iraq which would cause the supply of heating oil to decrease. He further indicated that as winter approached, demand for heating oil would increase. He stated that in previous wars, investors had been successful in investing in heating oil futures and options. Brothers' notes state, "I'll Double your (or better) money in a [month]. Or: at least a 20% profit." Pl.'s Tr. Ex. 629.

On one occasion, when Siegel and Brothers met in person at a restaurant, Siegel wrote down an example of how an out-of-the-money call option would work. This example was admitted at trial. To summarize, it shows how Brothers would make money if she purchased an out-of-the-money call option for heating oil and the price of the heating oil futures market subsequently increased. Siegel assumed a delta of 40%, and calculated that for every upward penny move in the price of the heating oil futures market, Brothers would make $168 per option.[10] Siegel did not present a written example of what would happen if the price of the heating oil futures market decreased or if delta was a smaller number, although he did mention that she could lose part or all of her investment. At the same meeting, Siegel also told Brothers not to invest all of her retirement funds in commodity options trading.

Brothers still was hesitant to invest. Siegel called her numerous additional times urging her to go ahead. Brothers signed the account opening documents on October 10, 2002. Although Siegel testi-fied that he never assisted clients with filling out these forms, the Court finds that Siegel instructed Brothers on how to answer certain questions in order for her to meet the minimum financial requirements to open an account. The Court also finds credible Brothers' testimony that Siegel told her that these documents and disclosures were mere formalities. Siegel told Brothers to represent her annual gross income as $38,000 (this was more than her actual salary) and her net worth as $100,000 (it is unclear whether this exceeded her net worth). The notes that Brothers took during her conversations with Siegel state:

> Remember these # s per Rick
> 38/100
> they don't
> follow up
> they don't [check]
> those [numbers]
> just do it!

Pl.'s Ex. 629. Brothers' account opening documents indicate that she did in fact use these numbers as Siegel instructed. Also, Brothers used those amounts when questioned about gross income and net worth in the compliance interview conducted by Risk Capital's trading desk just before placing her first order to purchase call options.

In filling out the New Account Checklist form, Brothers originally answered "yes" to question 12, which asks "Have you been instructed or prompted by any person to knowingly provide false, inaccurate or untruthful information on your account opening documents?" Siegel's assistant, Chambers, personally picked up the completed account opening documents from Brothers at her place of employment. Chambers

---

**10.** The assumption of a delta of .40 in the case of a deep out-of-the-money option is inappropriate. For such an option, delta would be close to zero. The Court finds that use of the .40 example was misleading and deceptive.

reviewed the documents before leaving and noticed that Brothers had answered "yes" to question 12. Chambers told Brothers to change her answer to this question or the account would not be approved. Brothers checked "no," circled the new answer, and initialed it. Def.'s Tr. Ex. 17 (RS–00029).

The account was approved by a Risk Capital branch manager on October 11, 2002. On October 14, 2002, Brothers, acting on Siegel's advice, purchased five call options for heating oil futures for $4,900. $1,000 went to Risk Capital in the form of commissions ($200 per option) and $225 went to the NFA in the form of fees ($45 per option). Thus, the value of Brothers' options was $3,675. Per Brothers' instructions, Siegel put a 50% stop-loss on the trade.

Approximately one week later, the market turned downward. Siegel tried unsuccessfully to reach Brothers to get her approval to sell the heating oil call options. The market fell until the stop loss was activated. The call options were liquidated for $1,679.80.

Siegel turned Brothers' account over to Chris Harris, a trading advisor at Risk Capital. Siegel expressed to Brothers that Chris Harris was an expert, and that he could make her money back. Brothers' notes state the following:

> Do as he says
>
> I trust him
>
> In re: Chris Harris
>
> We'll make back the monies and use that for our futures.

Pl.'s Tr. Ex. 629. Brothers put more money into the account. On October 22, 2002, Harris purchased seventeen put options[11] on wheat futures for $16,490.68 on Brothers's behalf. Of that, $3,400 went to commissions and $765 went to NFA fees. The premium for the put options, therefore, was approximately $12,325. Brothers lost money on this investment as well.

Brothers did one final investment with Siegel, purchasing two wheat futures contracts on November 7, 2002. The details of this investment were not explained at trial.

Brothers told Siegel that her home was "in distress" and that she wanted to close her account. He told her that she should not be trading if her home was in distress. A couple of days later, Brothers received a check in the amount of $11,412. Her total investment with Risk Capital was $19,714 (including commissions and fees), of which she lost $8,301.92 (42.1%).

## II. Conclusions of Law

### A. Liability

■ "[T]he [Commodity Exchange Act] is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." CFTC v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1329 (11th Cir.2002).

Regarding the sale of commodity futures, the Act provides that:

> It shall be unlawful . . . for any member of a registered entity, or for any corre-

---

11. A put option is the opposite of a call option. Whereas a call option is the right to purchase the underlying commodity futures contract at the strike price before the expiration date, a put option is the right to *sell* the underlying commodity futures contract at the strike price before the expiration date. Whereas the purchaser of a call option is betting that the price of the underlying commodity futures contract will increase, the purchaser of a put option is betting that the price of underlying commodity futures contract will decrease.

spondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any registered entity, for or on behalf of any other person . . . -

> (i) to cheat or defraud or attempt to cheat or defraud such other person;
>
> \* \* \* \* \* \*
>
> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

7 U.S.C. § 6b(a)(2)(C)(i), (iii).

Regarding the sale of commodity options, it is unlawful: for any person directly or indirectly

> (a) To cheat or defraud or attempt to cheat or defraud any other person; . . . [and]
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

The NFA "is a congressionally authorized futures industry self regulatory organization . . . [the purpose of which is] to assure high standards of business conduct by its Members and to protect the public interest." *R.J. Fitzgerald*, 310 F.3d at 1326 n. 3. APs such as Siegel are required to be members of the NFA and are governed by its rules.

Of particular relevance to the instant case is NFA Rule 29–2, which prohibits certain deceptive sales practices. Rule 29–2 generally prohibits "any communication with the public which: (1) operates as a fraud or deceit; (2) employs or is part of a high-pressure approach; or (3) makes any statement that futures trading is appropriate for all persons."

The NFA also publishes interpretive notices further explaining the reach of Rule 29–2 with respect to specific conduct and sales pitches. Interpretive notices have the force and effect of NFA Rules. The thrust of these rules and interpretive notices is that an AP cannot make customers think that they are more likely to make money than lose money. One such interpretive notice issued May 23, 1996 discusses, among other things, a specific example of a deceptive sales pitch called "seasonal trades." A misleading claim about a seasonal trade occurs when, for example, an AP convinces a customer to purchase call options on heating oil futures, stating that winter is nearing and the demand for heating oil will increase as people try to heat their homes and businesses. Another example involves soliciting a customer to purchase options on crude oil futures, stating that the summer "driving season" is nearing and the demand for gasoline will drive gas prices upward.

In November of 2002, the CFTC issued a commission advisory regarding misleading claims about investment opportunities resulting from the possibility of war with Iraq.

The foregoing sales pitches are misleading because such known, available information about supply and demand is already factored into the futures price of the commodity.

In order to establish fraud under the Act, Plaintiff must prove "(1) the making of a misrepresentation, misleading

statement, or a deceptive omission; (2) scienter; and (3) materiality." *R.J. Fitzgerald*, 310 F.3d at 1328. Although not entirely clear from the Act or case law, the parties agree that Plaintiff must prove the foregoing elements by a preponderance of the evidence. *Cf. Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (holding preponderance of the evidence to be the appropriate standard in cases brought under § 10(b) of the Security Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5, 17 C.F.R. § 240.10b–5).

■ "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328. Scienter exists when "Defendant's conduct involves highly unreasonable omissions or misrepresentations ... that present a danger of misleading which is either known to the Defendant or so obvious that Defendant must have been aware of it." *Id.* (internal quotations omitted). Finally, the materiality requirement is met when "it is substantially likely that a reasonable investor would consider the matter important in making an investment decision." *Id.* (internal quotations omitted).

The "overall message" in the instant case comprises (1) the risk disclosures in the account opening documents and compliance interviews; and (2) the representations made by Siegel to customers.

The risk disclosures in the Risk Capital Packet were replete with disclosures and disclaimers concerning the high degree of risk inherent in investing in commodity futures and options. The New Account Checklist contained in the Risk Capital Packet required prospective customers to affirmatively answer 12 questions about whether they read the risk disclosure documents and understood the risk of loss,

and whether anyone had coached them on how to answer these questions. The oral disclosures and questions provided in the Compliance Interview covered similar topics.

■ Notwithstanding the abundance of these risk disclosures, Siegel is not insulated from liability. "[T]he fact that [there is] a general risk disclosure statement does not automatically preclude liability under the [Commodity Exchange Act] where the overall message is clearly and objectively misleading or deceptive." *R.J. Fitzgerald*, 310 F.3d at 1330; *see also CFTC v. Sidoti*, 178 F.3d 1132, 1136 (11th Cir.1999) ("We seriously doubt whether boilerplate risk disclosure language could ever render an earlier material misrepresentation immaterial."); *Clayton Brokerage Co. of St. Louis, Inc. v. CFTC*, 794 F.2d 573, 580 (11th Cir.1986) ("[P]resentation of the risk disclosure statement does not relieve a broker of any obligation under the [Commodity Exchange Act] to disclose all material information about risk to customers.").

■ Plaintiff did not prove by a preponderance of the evidence that Siegel made misrepresentations or material omissions of fact with respect to Brown, Maiorino, and Wiegand. With respect to Maiorino, Siegel had only a brief conversation concerning whether Maiorino could purchase a call option with a different strike price. This in no way amounts to a misrepresentation. With respect to Brown and Wiegand, their testimony was insufficient to establish that Siegel made misrepresentations. Brown vaguely testified that the reasons Siegel gave for investing in soybeans and wheat had something to do with drought, harvest shortages, and pestilence in various areas of the world that would depress the supply of those commodities. As for Wiegand, he testified

that Siegel merely expressed hope that he could make back Wiegand's money lost on a previous trade with another account executive. This does not constitute a violation of the Act.

Plaintiff also did not prove that, as to Brown and Wiegand, Siegel should have disclosed his or Risk Capital's track record. In *R.J. Fitzgerald*, 310 F.3d at 1332–33, the Court held that where the defendant knew that 95% of its customers lost money and painted an otherwise "extremely rosy picture for profit potential," it was misleading not to disclose its track record. Brown's first trade and Wiegand's only trade with Siegel took place in May and April 2002, respectively, which was before this Court found that Siegel had knowledge of his or Risk Capital's track record. While Siegel may have had knowledge of their track records by the second trade with Brown in September 2002, Plaintiff did not establish that Siegel painted such a rosy picture to Brown as to require disclosing them. *See id.*

In sum, the evidence with respect to Brown, Maiorino, and Wiegand is insufficient to establish that Siegel violated the Act.

 In contrast, the overall message presented by Siegel to Brothers amounted to misrepresentation and material omission of facts. Although Risk Capital provided general risk disclosures and Siegel intermittently made statements that Brothers could conceivably lose part or all of her investment, Siegel's other statements (for example "I'll double your money in a month") undercut these warnings and made Brothers believe that she was more likely to make money than to lose money. This is the hallmark of misleading sales practices under the Act.

Additionally, Siegel coached Brothers on how to answer the questions in the Risk Capital Packet and the Compliance Interview, stating that they were just "formalities." Brothers' notes from their conversations reflect this, as do her answers to the questions in the account opening documents, and her affirmative answer to question 12 of the New Account Checklist asking whether she had been instructed or prompted by any person to provide untruthful information on these documents. Such coaching amounts to a misrepresentation under the Act. *See CFTC v. Trinity Fin. Group, Inc.*, 1997 WL 820970, at *9–10 (S.D.Fla. Sept.29, 1997), *aff'd in relevant part sub nom. CFTC v. Sidoti*, 178 F.3d 1132 (11th Cir.1999) (finding similar statements to be misleading and fraudulent); *Clayton Brokerage Co.*, 794 F.2d at 580 ("Oral representations may effectively nullify the warnings in the statement by discounting its general significance and its relevance to the customers' particular situation.").

 The Court also concludes that Siegel's nondisclosure of his and Risk Capital's track record—which the Court found he knew by the fall of 2002—was a material omission of fact. Plaintiff established that approximately 97% of Risk Capital's customers lost money. The Court found that Siegel's customers did lose money the vast majority of the time. As was the case in *R.J. Fitzgerald*, 310 F.3d at 1332, disclosing these track records "would have gone a long way in balancing out" "the extremely rosy picture for profit potential" painted by Siegel.

Siegel attempts to distinguish *R.J. Fitzgerald* on the ground that in this case there was no evidence that Siegel or Risk Capital calculated their track records. This argument is not persuasive. While Siegel may not have known his or Risk Capital's exact track records while at Risk Capital, the percentages as shown by Plaintiff's Exhibit 97 are so overwhelming

that he must have had some awareness of them, at least by the fall of 2002. This Court found that Siegel had general knowledge of the fact that the vast majority of his and Risk Capital's customers lost money. In light of Siegel's positive statements concerning his experience, his ability to handle the risk, that he could double her money, and his downplaying the importance of the account opening documents and its risk provisions, it was a material omission not to disclose the fact that the vast majority of his customers and Risk Capital's customers had lost their investments.

The Court now turns to the element of scienter, which is "established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care. . . . Scienter is met when Defendant's conduct involves highly unreasonable omissions or misrepresentations . . . that present a danger of misleading which is either known to the Defendant or so obvious that Defendant must have been aware of it." *R.J. Fitzgerald,* 310 F.3d at 1328 (internal quotations omitted).

The Court finds no difficulty in concluding that Siegel acted with scienter. Siegel was highly knowledgeable about commodity investments. His previous experience on the floor of the Chicago Board of Trade make it undeniable that he had a deep understanding of the commodities markets and the great risk of failure associated with the low-grade investments that he was selling at Risk Capital. He therefore was acutely aware of the fact that deep out-of-the-money options have very little chance of becoming profitable, especially accounting for the transaction costs (commissions and fees) associated with these investments. Risk Capital's 97% loss rate bears this out.

Having worked at Risk Capital for 8 to 9 months prior to soliciting Brothers, Siegel had to have been aware of both his and Risk Capital's general track record. Although Siegel strenuously argues that neither he nor Risk Capital calculated their loss rate, the loss rate is so high in this case that Siegel had to have appreciated the fact that virtually all of Risk Capital's customers lost money. Despite this knowledge, he referred to the compliance questionnaires as "formalities;" downplayed the risk associated with the investments; passed Brothers off to trading advisors (sometimes calling them "experts") who he knew were not successful; and otherwise took advantage of Brothers' lack of understanding. The Court concludes that Siegel's actions were an extreme departure from the standards of ordinary care and that Siegel thus acted with scienter.

Finally, the materiality of these misrepresentations and omissions of fact is not in serious dispute and an in-depth discussion of this element is unnecessary. Even considering the misrepresentations in light of the abundance of pro forma risk disclosures provided in Risk Capital's packet and compliance interviews, materiality is not in issue. *See Sidoti,* 178 F.3d at 1136 (rejecting the argument that such pro forma risk disclosures rendered previous misrepresentations immaterial).

However, one item warranting brief discussion is the materiality of Risk Capital's track record. Omission of Risk Capital's general track record is material in this case because of Risk Capital's practice of transferring clients to trading advisors after account executives, such as Siegel, opened an account and made the first trade. It therefore was a material omission on Siegel's part not to disclose Risk Capital's general track record when he

knew that the trading advisors to whom customers would be transferred lost money the vast majority of the time. The Court does not hesitate to conclude that "it is substantially likely that a reasonable investor would consider [this] matter important in making an investment decision." *R.J. Fitzgerald,* 310 F.3d at 1328 (internal quotations omitted).

The Court therefore concludes that Plaintiff established by a preponderance of the evidence that Siegel's dealings with Brothers directly violated the anti-fraud provisions of the Act, specifically, 17 C.F.R. § 33.10 dealing with the sale of commodity options.

On a final note, the Court adds that Brothers most likely was not Siegel's only victim. Risk Capital's business model was designed to convince unsophisticated and financially insecure people to invest money (thereby generating commission income for the firm) through engaging in deceptive and high-pressure sales practices, many of which specifically were prohibited by the NFA. Siegel knew this and actively furthered the scam. He played a crucial, enabling role by persuading prospective clients to open accounts and, at least in one case, encouraging them to misrepresent their income and net worth so that the account could be opened; placing the first trade; transferring the clients to trading advisors, referring to them as commodity investments experts thereby giving the impression that the client's money was in good hands; and convincing disgruntled customers who had lost money on previous trades to stay on board for additional trades.

In short, Siegel aided and abetted Risk Capital's scheme to defraud customers. Although Plaintiff did not make such an allegation, this Court finds it too obvious to ignore. The Act imposes aider and abettor liability on "any person who commits, or who willfully aids, abets, counsels,

commands, induces, or procures the commission of, a violation of the provisions of this chapter." 7 U.S.C. § 13c(a). Imposition of such liability is appropriate when a defendant "knowingly associates himself with an unlawful venture, participates in it to bring it about, and seeks by his actions to make it succeed." *CFTC v. Trinity Fin. Group, Inc.,* 1997 WL 820970 (S.D.Fla. Sept.29, 1997) (internal quotations omitted), *rev'd on other grounds sub nom. CFTC v. Sidoti,* 178 F.3d 1132 (11th Cir.1999). The findings of fact clearly establish that all of the elements for aider and abettor liability are met in this case. Accordingly, the Court considered Siegel's role as an aider and abettor in granting injunctive relief and assessing civil monetary penalties against Siegel.

### B. *Relief*

#### 1. *Injunctive Relief*

In order to be entitled to injunctive relief, Plaintiff had to show a reasonable likelihood that Siegel would violate the Act in the future. *See SEC v. Ginsburg,* 362 F.3d 1292, 1304 (11th Cir.2004); *Sidoti,* 178 F.3d at 1137. The factors to be considered are "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Ginsburg,* 362 F.3d at 1304 (quoting *SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir.1982)).

These factors support the imposition of limited injunctive relief. Plaintiff did not show that Defendant's actions in this case were extremely egregious or that his misrepresentations were recurrent or widespread. That notwithstanding, the Court believes that Brothers was not the

only customer of Siegel who unwittingly invested with him in reliance on his self-proclaimed expertise and knowledge of the commodities markets and ability to make large profits. Siegel provided the Court with no assurances against future violations; he totally denied wrongdoing. Furthermore, he testified that he currently writes (or "grants") options, so the Court believes that his current occupation presents the opportunity for future violations. The Court thus finds that Plaintiff proved by a preponderance of the evidence that there is a probability of future violations.

Accordingly, the Court permanently enjoins Siegel from committing any further violations of the Act, either directly or indirectly. This includes, but is not limited to, making misrepresentations of material facts to clients in connection with the purchase or sale of commodity futures contracts and options. The Court declines to permanently or temporarily enjoin Siegel from trading on the behalf of others in the commodity futures and options market. Plaintiff simply did not meet its burden to justify an injunction of such breadth.

### 2. Restitution and Disgorgement of Profits

As the Act expressly authorizes the Court to provide the equitable remedy of an injunction in 7 U.S.C. § 13a–1, the Court has the authority to award "ancillary equitable relief," including restitution. See Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) (upholding restitution awarded incident to an injunction and stating that "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied"); Mitchell v. Robert DeMario Jewelry, 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) ("When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes."); Federal Trade Comm'n v. United States Oil & Gas Corp., 748 F.2d 1431 (11th Cir.1984) (same); AT&T Broadband v. Tech. Communs., Inc., 381 F.3d 1309 (11th Cir.2004) (same).

Plaintiff seeks restitution to compensate all of Siegel's customers who lost money. However, Plaintiff's evidence was insufficient to warrant such an extensive remedy. Plaintiff's evidence only specifically showed that one customer witness—Sandra Brothers—was defrauded by Siegel. Thus, the Court will award restitution only to Brothers in the amount of $8,301.92, plus pre-judgment interest from November 12, 2002 (the date Brothers' account with Risk Capital was closed) to the date of judgment at the prevailing rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621.

Disgorgement is not warranted in this case as an award of both restitution and disgorgement of profits would be improperly punitive in nature. See Sidoti, 178 F.3d at 1138.

### 3. Civil Monetary Penalties

7 U.S.C. § 9 and 17 C.F.R. § 143.8 authorize the Court to impose civil monetary penalties of up to the greater of $120,000 per violation or triple the monetary gain experienced by the defrauding party. Siegel committed numerous violations of the Act in his dealings with Brothers and also by aiding and abetting Risk Capital's general scheme to defraud customers.

In selecting the monetary penalty in this case, the Court is guided by the evidence which showed that Siegel committed numerous violations, though on occasion he appeared to try to do right by his clients. The Court assesses civil monetary penal-

ties against Siegel in the amount of $150,000.

### III. *Conclusion*

In summary, the Clerk is directed to enter judgment in favor of Plaintiff and against Defendant as follows:

- Restitution for the benefit of Sandra Brothers in the amount of $8,301.92, plus pre-judgment interest from November 12, 2002 to the date of judgment at the prevailing rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621.
- Civil monetary penalties in the amount of $150,000.

The judgment shall further reflect that Defendant is permanently enjoined from committing any further violations of the Commodity Exchange Act, either directly or indirectly, including, but not limited to, making misrepresentations of material facts to clients in connection with the purchase or sale of commodity futures contracts and options.

Plaintiff is awarded costs.

### ATTACHMENT

*presented by:*

### RISK CAPITAL TRADING CORP.
### PLAIN TALK ABOUT RISK

*An Introduction to Understanding the Risks of Futures and Options Trading and General Concepts of Financial Risk*

This booklet has in large part been adapted from *Plain Talk About Risk* which was produced by the National Futures Association as a service to the investing public. It has been modified by Risk Capital Trading Group and is provided here as a courtesy to its clients.

### Plain Talk About Risk

Introduction. RCTG01652

ATTACHMENT—Continued

THIS BRIEF GUIDE IS NOT A SUB- STITUTE FOR THE CFTC RE- QUIRED RISK DISCLOSURE STATEMENT, WHICH SHOULD BE CAREFULLY READ, UNDER- STOOD AND CONSIDERED BE- FORE MAKING A DESCISION TO DEPOSIT FUNDS FOR FUTURES OR OPTIONS TRADING.

Plain Talk About Risk

Introduction.

The object of this guide is to briefly explain in straightforward plain-language some of the many risks involved in futures and options trading. It also attempts to describe some basic concepts of financial risk itself in a way that is not only understandable, but also useable in evaluating the risks of futures and options. For it is precisely and only the assumption of risk of loss that gives rise to the opportunity for profit in the first place.

Risk is fundamental to profit. The terms *risk* and *profit* are inseparable, opposite sides of the same coin. So the profit potential of any given financial opportunity can only be assessed in the context of its attendant risks.

This booklet is divided into two sections. The first section is a brief, general discussion on the concept of financial risk. The second section will try to identify some of the specific risks and other significant aspects of trading in futures and options. If you trade, you are certain to confront these risk-related issues. Both sections, loosely termed here as systematic and specific risks, are necessarily incomplete and should serve only as an introduction to the concepts and aspects of futures and options risk.

### About Financial Risk.

An exhaustive study of the concept of risk would span subjects from mathematics to philosophy, psychology to economic behavior, and include quantitative as well as qualitative analyses. Ultimately, the interpretation of risk is highly subjective and personalized.

Where someone falls on the Risk Aversion Curve, in other words, their "risk tolerance," depends on many diverse and unique considerations. While risk and reward are always commensurate, the implications and effects of the potential or actualized gain or loss on any given Individual can be very different from another.

In the final analysis, the question must be answered qualitatively: Will an investor's quality of life be improved more by the expected gain than will it be decremented by the potential loss? The very essence of the economic concept of the Diminishing Marginal Utility of Money.

Risk has two aspects: 1) The probability that a loss will occur, and 2) the amount of money that is at risk if the loss does occur. In other words, the probability and magnitude of the potential loss. To illustrate, on the extreme ends of the risk spectrum are a lottery ticket and a U.S. Treasury bond. The lottery ticket has an extremely high probability of a loss occurring, but a very small amount of money at risk. On the other hand, the Treasury bond has a very small chance of loss, but, if a loss does occur, a much greater amount of money would be lost.

Between these two extremes on the spectrum of risk lie virtually all financial investments, speculations and gambles. The risk evaluation process must weigh and consider both aspects of risk to be effective.

Futures markets (and to a lesser extent options) are anticipatory price discovery mechanisms. The futures price constantly changes placing premiums and discounts to reflect future expectations of market participants. Some academics theorize that at any given time the current market price of any commodity (stock or other liquid asset) reflects all known information about that market, and any future price movement is an absolute uncertainty, completely random in nature (i.e., Random Walk Theory).

The mental picture of all market participants divided into two equal groups captures this concept. Half think the market will go up, the other half think it will go down. When one market participant changes his or her mind and moves to the other side, the market price will change until all market participants are again divided into two equal groups.

Theoretically and practically, *no one knows which way the market will move.* Not your broker, not the principals of the firm, not the exchanges, not market-makers, not even the government, Federal Reserve Board Chairman or the President of the United States himself. We emphasize this point because it should always be kept in the forefront of one's mind while viewing the futures market or any other market. (In fact, if anyone did ever truly know in advance where the market was going, the very integrity of the market itself would be beached.) Furthermore, it is philosophically true and statistically proven that the past price movement of any given market is not, and cannot be, predictive or even indicative of future price movement.

The futures markets, and other liquid markets, reflect the uncertainty that looms over all human affairs. Indeed, the origin of the futures market itself is derived from people's innate desire to identify and avoid

such uncertainties. One of the major functions of modem futures markets is to transfer risk. Those who are willing to accept the transfer of these risks do so in hopes of generating a profit, because they are speculating on whether the price will rise or fall from its current level.

**Risks of Futures and Options.**

In considering whether to trade in the high risk futures and options markets where there exists a substantial degree of price volatility and financial leverage, you should understand and seriously consider all of the following real risk factors which you are certain to encounter:

1. Trading in futures and options involves an extremely high degree of risk of loss. Investors can and do lose all or part of the money they deposit. Because of the volatile nature of futures and options, the market price and, consequently, the value of your account can rise and fall sharply without notice. The use of leverage and/or options can substantially increase your risk of loss. Deposit only risk capital, in other words, *money you can afford to lose.*

2. As the result of an adverse price movement, or other factors, you may sustain a total loss of your initial deposit (including commissions paid) and any additional funds that you deposit. You may also be subject to losses that exceed the amount deposited in your account when trading in futures and short (opening sell) options. The use of leverage generally causes the value of your market position to change at a greater rate than that of the underlying asset, substantially increasing the risk of loss.

3. Option trading is a zero-sum game; for every dollar of profit there is an equal dollar of loss. Some studies have shown that more than eighty-five percent of small investors who trade options ultimately lose money. An option is an extremely complicated trading vehicle, which carries substantial risks that are not inherent to the trading of the underlying asset. For example, options lose value with the passage of time (time-decay); options are generally not fully responsive to the price movement of the underlying asset (delta). Option profitability is substantially dependent on the exercise (strike) price of the option relative to the underlying market price. An option with a strike price that is "deep out-of-the-money" is has only a remote chance of ever becoming profitable. Long (opening buy) options have risk that is limited to the amount of the option premium plus the commission, however, short (opening sell) options have unlimited risk. You should familiarize yourself with the specific and systematic risks, terminology, and workings of long and short, call and put options before depositing money for options trading.

4. No trading system has ever been devised that can consistently produce profits or predict the market. It is only the assumption of risk of loss that gives rise to the opportunity to profit. Some academics theorize that at any given time the current market price of any commodity or stock (or other liquid asset) reflects all known information about that market, and any future price movement is an absolute uncertainty, completely random in nature (i.e., Random Walk Theory). Past price performance is not necessarily predictive of future results. The trade recommendations of brokers, traders, advisors, and analysts represent only their opinions and are normally insignificant in the face of the overall market.

5. Placing certain types of orders, such as stop-loss or stop limit orders, which may be intended to limit the amount of loss, may not be effective because price movement or market conditions can make

it impossible to execute such orders. Strategies utilizing spreads and/or straddles may have as much risk as simple long or short positions. It may be difficult or impossible to execute orders and offset or liquidate open market positions due to market liquidity and/or operations.

6. Commissions, bid/ask spreads, and other transaction costs can have a substantial adverse effect on your market positions' ability to break even, and, therefore, your ultimate profitability or loss. In order for you to achieve a net profit on any transaction, the price received upon the sale of the market position must exceed the purchase price by at least the amount of any commissions paid and other transaction costs. Trading futures and/or options may involve frequent purchase and sale transactions, resulting in significant commissions and costs. Commission charges and other such cost increase the risk of loss and can account for all or part of trading losses. Generally, to calculate your breakeven price, total all commissions and fees, divide by the unit quantity involved in the transaction, and then add the result to the buy price or subtract it from the sell price.

7. There is always a risk associated with the solvency of the exchange, the clearing firm and the counter-party to your transactions. There is no governmental or private institution or party that can truly "guarantee" performance on open positions in the any market, nor is the brokerage or clearing firm insured against default or insolvency.

8. Any transactions that are made in international over-the-counter markets outside of the jurisdiction of the United States government are not subject to U.S. government regulation. Foreign markets may have regulations that differ significantly from those in the US, and may

afford substantially less customer protection. While some off-exchange markets are highly liquid, such transactions may involve greater risk than trading in the U.S. counterparts because there is no exchange on which to close out open positions.

9. Significant conflicts of interest exist between you and the brokerage firm, the clearing firm and the exchanges. A conflict exists because the brokerage firm and clearing firm stand to gain from increased trading activity in your account, which generates increased brokerage commissions and/or clearing fees. Both the brokerage and clearing firms are free to engage in any futures or option transaction, capacity or activity that either deems appropriate, despite whether it may present an apparent, potential or actual conflict of interest with your account.

10. Trading on an electronic trading system (ETS) may differ significantly from non-electronic trading environments. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system, including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instruction or is not executed at all.

You should have sufficient knowledge and experience in financial and investment matters as to be capable of under-standing and evaluating the risks and merits of trading in futures and options. If you lack such knowledge and experience, or do not understand futures and options, you should seek the advice of a qualified attorney or trained financial advisor before depositing any money for trading purposes.

This brief statement cannot identify all of the risks and other significant aspects of trading in futures and options. You should, therefore, carefully study and un-

derstand the CFTC required Risk Disclosure Statement and all aspects of the account, the market, and the trading vehicle, prior to depositing any money for trading. If you do not understand any part of the Risk Disclosure Statement, seek the advice of a qualified attorney or trained financial advisor.

**Suggested Reading.**

*Risk, Uncertainty and Profit*

Frank H. Knight, McMilian Publishing Co.

*The Remarkable History of Risk*

Peter L. Bernstein, John Wiley & Sons, Inc.

*Portfolio Selection & Efficient Diversification of Investments*

Harry Markowitz, Baldwin Publishing

*The Complete Guide to Futures Trading*

Jack Schwager, Harper Business

*Option as a Strategic Investment*

Lawrence McMillan, New York Institute of Finance

*Option Volatility and Pricing Strategies*

Sheldon Natenburg, Probus Publishing Co.

*Market Wizards*

Jack Schwager, Harper Business

## CUSTOMER ACCOUNT DOCUMENTATION SUPPLEMENT

New Account Checklist ................. 2
Additional Risk Disclosure .............. 3
For Our Mutual Protection .............. 3
Commission & Fee Disclosure ........... 4

*To open an account: Carefully read these and all other materials supplied in connection with opening your account, including the Risk Disclosure Statement. Sign no part of this or any other document without first having carefully read and considered the material. Seek the advise of a trained financial advisor or a qualified attorney if you do not understand any part of the documentation.*

### NEW ACCOUNT CHECKLIST

1. Have you carefully read the account opening documents and risk disclosures enclosed herewith? ( )yes ( )no

2. Do you have any questions regarding any of these documents? ( )yes ( )no

3. Do you understand that futures/options trading involves a high risk of loss and you could lose part or all of the funds that you invest? ( )yes ( )no

4. Has anything been represented to you contrary to question 3 above? ( )yes ( )no

5. Do you understand: That no trading system has ever been devised that can consistently produce profits or predict the market; That a seasonal increase in demand for, or supply of, a specific commodity will not typically result in an increased option value; That the trade recommendations of brokers, traders, advisors, and analysts represent only their opinions and are normally insignificant in the overall market? ( )yes ( )no

6. Do you understand that all known market news is already factored into the price of an option and/or underlying futures contract and you are speculating on future events that cannot be predicted? ( )yes ( )no

7. Do you understand that a rise in the underlying futures contract does not typically correlate on a one-one basis with a rise in the price of an option on the futures contract? ( )yes ( )no

8. Do you understand that past tendencies of a futures contract cannot be relied upon to predict the future price movements of an option or futures contract? ( )yes ( )no

9. Do you fully understand and agree that only risk capital (i.e., funds you can afford to lose) will be used to fund this account? ( )yes ( )no

10. Have you received any guarantees of profits or assurances that funds will not be lost? ( )yes ( )no

11. Is the income, net worth and other information, which you have provided in the account opening documentation accurate? ( )yes ( )no

12. Have you been instructed or prompted by any person to knowingly provide false, inaccurate or untruthful information on your account opening documents? ( )yes ( )no

_____ _____
Signature (Customer 1) Signature (Customer 2)

_____ _____
Print Name & Date Print Name & Date

## ADDITIONAL RISK DISCLOSURE STATEMENT

If you're Customer Financial Questionnaire reflects one or more of the following:

1. An income of less than 540,000,
2. A net worth of less than $60,000,
3. You are over the age of 59, or
4. You have no previous investment experience,

You should read this statement carefully because it may be interpreted that: (1) The amount of money you are considering depositing for the purpose of trading futures and options may be excessive relative to your net worth or annual income, or (2) based on your age, investment experience or personal circumstances, trading in futures or options may involve too high a risk of loss.

The trading of futures and options involves an extremely high degree of risk of loss and is inappropriate for many individuals. Some studies have shown that more than eighty-five percent of small investors who trade in futures and options ultimately lose money. You could lose all or part of the money you deposit for trading. If you meet any of the criteria set forth above, or if you have pursued only conservative forms of investment in the past, you may wish to study the risks of loss involved in futures and options trading further before you deem it appropriate for you, or you may decide it is inappropriate and never trade.

If you decide to open a futures and options trading account, we ask that you acknowledge below that you fully understand the very risky nature of futures and options trading and that the funds you intend to deposit are purely risk capital (i.e., money you can afford to lose). You further acknowledge that the loss of any deposited funds will not jeopardize your standard of living, nor will it substantially detract from your retirement program or other personal or family needs, and that such funds have not been borrowed.

_____ _____
Signature (Customer 1) Signature (Customer 2)

_____ _____
Print Name & Date Print Name & Date

## FOR OUR MUTUAL PROTECTION

Prior to investing, you should discuss any questions you have with your broker and have all questions answered satisfactorily before committing any funds. Your broker is not permitted to make any statements at variance with, or which tends to negate or minimize any of the information set forth in the disclosure statements. If your broker has made any such statements or suggests that you otherwise disregard the importance of such disclosures, we urge you to immediately notify the Compliance Department at 1–800–998–8124.

_____ _____
Signature (Customer 1) Signature (Customer 2)

_____ _____
Print Name & Date Print Name & Date

## FEE SCHEDULE DISCLOSURE

### COMMISSIONS

The commission to be charged in connection with the purchase of each commodity option is Two Hundred Dollars ($200.00) US. Commodity option clients will realize profit only if the option is sold or exercised at a time when the premium received at the time of sale, or upon exercise, exceeds the premium paid plus commissions and fees.

The commissions and fees payable to Risk Capital Trading Group, Inc. ("RCTG") hereunder have been arbitrarily determined. The commissions and fees for similar services vary considerably within the futures industry. The commissions and fees payable to RCTG substantially affect a client's ability to make a profit in his/her account, increase the risk of loss,

and can account for part or all of client's losses.

Trading futures and/or options may involve frequent purchase and sale transactions, resulting in significant commissions and costs. Commissions and other transaction costs can have a substantial adverse effect on your ability to break even, and, therefore, your ultimate profitability or loss. In order for you to achieve a net profit on any transaction, the price received upon the sale of the market position must exceed the purchase price by at least the amount of any commissions paid and other transaction costs. Generally, to calculate your breakeven price, total all commissions and fees, divide by the unit quantity involved in the transaction, and then add the result to the buy price or subtract it from the sell price.

## OTHER FEES

In addition to the commission described above, a flat fee in the amount of Forty-five Dollars and four cents ($45.04) is charged to the client upon opening each option and a flat fee of No Dollars and four cents ($00.04) is charged upon closing each option. These fees defray RCTG's costs incurred in clearing and processing each option transaction, plus postage and courier services. To the extent that it can be determined that actual cost incurred in any particular account do not equal the amount charged on any given transaction (i.e. opening and closing each option), this charge must be viewed as additional commission.

## DEEP OUT OF THE MONEY OPTIONS

A person contemplating the purchase of a deep out of the money option (that is, a call option with a strike price significantly above, or a put option with a strike price significantly below the current rice of the underlying futures contract) should be aware that the chance of such option becoming profitable is ordinarily remote. On the other hand, a potential grantor of a deep out of the money option should be aware that such options normally provide small premiums while exposing the grantor to all the potential losses described in the Risk Disclosure Statement accompanying this form.

## FUTURES RIDER

RCTG's round turn commission rate per futures contact is One Hundred Twenty-Five Dollars ($125.00)

## ACKNOWLEDGMENT

I hereby acknowledge that I have received the Risk Disclosure Statement and the Fee Schedule Disclosure. I have read these documents carefully and understand the concepts of trading options on futures contracts and the disclosures contained in those documents.

| | |
|---|---|
| Signature (Customer 1) | Signature (Customer 2) |

| | |
|---|---|
| Print Name & Date | Print Name & Date |

### Understanding Options

*A Primer to the Uses and Risks of Buying Options on Futures Contracts*

This booklet has in large part been adapted from *Buying Options on Futures Contracts: A Guide to Uses and Risks*, which was produced by the National Futures Association as a service to the investing public. It has been modified by Risk Capital Trading Group and is provided here as a courtesy to its clients.

TRADING IN FUTURES AND OPTIONS INVOLVES AN EXTREMELY HIGH DEGREE OF RISK. INVESTORS CAN AND DO LOSE ALL OR PART OF THE MONEY THEY DEPOSIT.

PLEASE READ, UNDERSTAND AND CAREFULLY CONSIDER THE CFTC REQUIRED RISK DISCLOSURE STATEMENT BEFORE MAKING A DECISION TO TRADE FUTURES OR OPTIONS ON FUTURES.

## Understanding Options
*A Primer to the Uses and Risks of Buying Options on Futures Contracts*

### Table of Contents

Introduction ........................................................ 1256
Part One: The Vocabulary of Options Trading ..................................... 1257
Part Two: The Arithmetic of Option Premiums ................................... 1259
Intrinsic Value ....................................................... 1259
Time Value ......................................................... 1259
Part Three: The Mechanics of Buying and Writing Options ...................... 1260
Commission Charges .................................................. 1260
Leverage ........................................................... 1260
The First Step: Calculate the Break–Even Price .............................. 1261
Factors Affecting the Choice of an Option ................................... 1262
After You Buy an Option: What Then? ...................................... 1263
Who Writes Options and Why ............................................ 1265
Risk Caution ........................................................ 1266
Part Four: A Pre–Investment Checklist ...................................... 1267
Recommended Reading ................................................. 1267
National Futures Association Resources ..................................... 1268
About Risk Capital Trading Group ......................................... 1268

### Introduction

Although futures contracts have been traded on U.S. exchanges since 1865, options on futures contracts were not introduced until 1982. Initially offered as part of a government pilot program, their success eventually led to widespread use of options on agricultural as well as financial futures contracts.

Options on futures contracts can offer a wide and diverse range of potentially attractive trading opportunities. However, option trading is a speculative endeavor and should be treated as such. Even though the purchase of options on futures contracts involves a limited risk (losses are limited to the costs of purchasing the option), it is nonetheless possible to lose your entire investment in a short period of time. And for traders who sell rather than buy options, there is no limit at all to the size of potential losses.

This booklet is designed to provide you with a basic understanding of options on futures contracts—what they are, how they work and the opportunities (and risks) involved in trading them. The booklet consists of four parts:

**Part One: The Vocabulary of Options Trading.** Options trading has its own language—words or terms you may be unfamiliar with or that have a special meaning when used in connection with options.

**Part Two: The Arithmetic of Option Premiums.** This section describes the major factors that influence option price movements and the all-important relationship between option prices and futures prices.

**Part Three: The Mechanics of Buying and Writing Options.** This section outlines the basic steps involved in buying and

writing options, as well as the risks involved.

**Part Four: A Pre–Investment Checklist.** This section lists additional steps you should take before deciding whether to trade options on futures.

*Part One: The Vocabulary of Options Trading*

These are some of the major terms you should become familiar with, starting with what is meant by an "option."

**Option** An trading vehicle which gives the option buyer the right, but not the obligation, to buy or sell a particular futures contract at a stated price at any time prior to a specified date. There are two separate and distinct types of options: calls and puts.

**Call** A call option conveys to the option buyer the right to purchase a particular futures contract at a stated price at any time during the life of the option.

**Put** A put option conveys to the option buyer the right to sell a particular futures contract at a stated price at any time during the life of the option.

**Strike Price** Also known as the "exercise price," this is the stated price at which the buyer of a call has the right to purchase a specific futures contract or at which the buyer of a put has the right to sell a specific futures contract.

**Underlying Contract** This is the specific futures contract that the option conveys the right to buy (in the case of a call) or sell (in the case of a put).

**Option Buyer** The option buyer is the person who acquires the rights conveyed by the option: the right to purchase the underlying futures contract if the option is a call or the right to sell the underlying futures contract if the option is a put.

**Option Seller (Writer)** The option seller (also known as the option writer or option grantor) is the party that conveys the option rights to the option buyer.

**Premium** The "price" an option buyer pays and an option writer receives is known as the premium. Premiums are arrived at through open competition between buyers and sellers according to the rules of the exchange where the options are traded. A basic knowledge of the factors that influence option premiums is important for anyone considering options trading. The premium cost can significantly affect whether you realize a profit or incur a loss. See "The Arithmetic of Option Premiums."

**Expiration** This is the last day on which an option can be either exercised or offset. See the definition of "Offset" to be certain you know the exact expiration date of any option you have purchased or written. Options often expire during the month prior to the delivery month of the underlying futures contract. Once an option has expired, it no longer conveys any rights. It cannot be either exercised or offset. In effect, the option rights cease to exist.

**Quotations** Most, but not all, premiums for exchange-traded options are reported daily in the business pages of most major newspapers, as well as by a number of internet services. With an understanding of terms previously defined—call, put, strike price and expiration month—it is easy to determine the premium for a particular option. Take a look at the following quotation for gold options:

Gold (100 troy ounces; $ per troy ounce)

| Strike | Calls–Settle | | | Puts–Settle | | |
|--------|------|------|------|------|------|------|
| Price | Jan | Feb | Apr | Jan | Feb | Apr |
| 285 | 10.50 | 10.70 | 14.80 | .20 | 1.00 | 2.50 |
| 290 | 5.70 | 1.20 | 11.40 | .30 | 1.80 | 4.10 |
| 295 | 1.60 | 4.30 | 7.90 | 1.10 | 3.80 | 5.70 |
| 300 | .40 | 2.00 | 5.40 | 4.90 | 6.50 | 8.30 |
| 305 | .20 | 1.20 | 3.80 | 9.60 | 10.60 | 11.30 |
| 310 | .10 | .60 | 2.60 | 14.50 | 15.10 | 15.00 |

**Est. Vol.:** 4,400 Mon: 2,687 calls 5,636 puts
**Op Int:** Mon: 273,658 calls 121,133 puts

The premium for a February gold call option with a strike price of $295 an ounce is $4.30 an ounce. Therefore, for the 100 ounce option, the option buyer would pay a premium of $430 and the option writer would receive a premium of $430.

**Exercise** An option can be exercised only by the buyer (holder) of the option at any time up to the expiration date. If and when a call is exercised, the option buyer will acquire a long position in the underlying futures contract at the option exercise price. The writer of the call to whom the notice of exercise is assigned will acquire a short position in the underlying futures contract at the option exercise price. If and when a put is exercised, the option buyer will acquire a short position in the underlying futures contract at the option exercise price. The writer of the put to whom the notice of exercise is assigned will acquire a long position in the underlying futures contract at the option exercise price.

**Offset** An option that has been previously purchased or previously written can generally be liquidated (offset) at any time prior to expiration by making an offsetting sale or purchase. Most options traders choose to realize their profits or limit their losses through an offsetting sale or purchase. When an option is liquidated, no position is acquired in the underlying futures contract.

**In-the-money** An option is said to be "in-the-money" if it is worthwhile to exercise. A call option is in-the-money if the option exercise price is below the underlying futures price. A put option is in-the-money if the option exercise price is above the underlying futures price. Example: The current market price of a particular gold futures contract is $300 an ounce. A call is in-the-money if its exercise price is less than $300. A put is in-the-money if its exercise price is more than $300. The amount that an option is currently in-the-money is referred to as the option's intrinsic value.

**At-the-money** An option is said to be "at-the-money" if the underlying futures price and the option's exercise price are (approximately) the same.

**Out-of-the-money** A call option whose exercise price is above the underlying futures price is said to be "out-of-the-money." Similarly, a put option is "out-of-the-money" if its exercise price is below the underlying futures price. Neither option is worth exercising, and has no intrinsic value.

**Deep–Out–of–the–Money** An out-of-the-money (as described above) option has a strike price which is relatively far from the market price. While no strict definition exists, generally deep-out-of-the-money options can be identified in two ways: 1) the number of strike prices away from the market price, and 2) the value of the premium. An option which is four full strike prices away from the market price, or an option with a value of less than one percent of the value of the underlying futures contract, may be indications of deep-out-of-the-money options. (However, many exceptions exist.) Such options are considered the most speculative and generally have little likelihood of ever becoming profitable (intrinsic).

### Part Two: The Arithmetic of Options Premiums

At the time you purchase a particular option, its premium cost may be $1,000. A month or so later, the same option may be worth only $800 or $700 or $600. Or it could be worth $1,200 or $1,300 or $1,400. Since an option is something that most people buy with the intention of eventually liquidating (hopefully at a higher price), it's important to have at least a basic understanding of the major factors which influence the premium for a particular option at a particular time. There are two, known as intrinsic value and time value. The premium is the sum of these: Premium = Intrinsic Value + Time Value

### Intrinsic Value

Intrinsic value is the amount of money, if any, that could currently be realized by exercising the option at its strike price and liquidating the acquired futures position at the present price of the futures contract.

At a time when a U.S.Treasury bond futures contract is trading at a price of 120–00, a call option conveying the right to purchase the futures contract at a below-the-market strike price of 115–00 would have an intrinsic value of $5,000.

As discussed earlier, an option that currently has intrinsic value is said to be "in-the-money" (by the amount of its intrinsic value). An option that does not currently have intrinsic value is said to be "out-of-the-money." At a time when a U.S.Trea-sury bond futures contract is trading at 120–00, a call option with a strike price of 123–00 would be "out-of-the-money" by $3,000.

### Time Value

Options also have time value. In fact, if a given option has no intrinsic value—because it is currently "out-of-the-money"—its premium will consist entirely of time value.

### What's "time value?"

It's the sum of money option buyers are presently willing to pay (and option sellers are willing to accept)—over and above any intrinsic value the option may have—for the specific rights that a given option conveys. It reflects, in effect, a consensus opinion as to the likelihood of the option's increasing in value prior to its expiration.

The farther an option's strike price is from the market price, the less time value it has. Conversely, options which are deep-in-the-money have little-time value. The time value of an option is always highest when it is at-the-money.

The three principal factors that affect an option's time value are:

1. Time remaining until expiration. Time value declines as the option approaches expiration. At expiration, it will no longer have any time value. (This is why an option is said to be a wasting asset.)

### Time Value of an Option Under Passage of Time

Time Value

Time to Expiration

2. Relationship between the option strike price and the current price of the underlying futures contract. The further an option is removed from being worthwhile to exercise the further "out-of-the-money" it is the less time value it is likely to have.

3. Volatility. The more volatile a market is, the more likely it is that a price change may eventually make the option worthwhile to exercise. Thus, the option's time value, and therefore premiums, are generally higher in volatile markets. Volatility, mathematically expressed, is the standard deviation of price movements of some period of time. However, as you can see, volatility is the "soft" number of the three factors discussed here; in other words, the other two factors are objective values, only volatility is subjective. As a consequence, there are many ways of calculating and interpreting volatility. Using the market price of option premiums to "back into" the volatility. This calculation derives what is known as "implied volatility".

### Part Three: The Mechanics of Buying and Writing Options

#### Commission Charges

Before you decide to buy and/or write (sell) options, you should understand the other costs involved in the transaction—commissions and fees. Commission is the amount of money, per option purchased or written, that is paid to the brokerage firm for its services, including the execution of the order on the trading floor of the exchange. The commission charge increases the cost of purchasing an option and reduces the sum of money received from writing an option. In both cases, the premium and the commission should be stated separately.

Each firm is free to set its own commission charges, but the charges must be fully disclosed in a manner that is not misleading. In considering option trading, you should be aware that:

1. Commission can be charged on a per-trade or a round-turn basis, covering both the purchase and sale.

2. Commission charges can differ significantly from one brokerage firm to another.

3. Some firms have fixed commission charges (so much per option transaction) and others charge a percentage of the option premium, usually subject to a certain minimum charge.

4. Commission charges based on a percentage of the premium can be substantial, particularly if the option is one that has a high premium.

5. Commission charges can have a major impact on your chances of making a profit. A high commission charge reduces your potential profit and increases your potential loss.

You should fully understand what a firm's commission charges will be and how they're calculated. If the charges seem high—either on a dollar basis or as a percentage of the option premium—you might want to seek comparison quotes from one or two other firms. If a firm seeks to justify an unusually high commission charge on the basis of its services or performance record, you might want to ask for a detailed explanation or documentation in writing.

#### Leverage

Another concept you need to understand concerning options trading is the concept of leverage. The premium paid for an option is only a small percentage of the value of the assets covered by the underlying futures contract. Therefore, even a small change in the futures contract price can result in a much larger percentage profit—or a much larger percentage loss—

in relation to the premium. Consider the following example:

An trader pays $200 for a 100–ounce gold call option with a strike price of $300 an ounce at a time when the gold futures price is $300 an ounce. If, at expiration, the futures price has risen to $303 (an increase of only one percent), the option value will increase by $300 (a gain of 150 percent on your original trade cost of $200). But always remember that leverage is a two-edged sword. In the above example, unless the futures price at expiration had been above the option's $300 strike price, the option would have expired worthless, and the trader would have lost 100 percent of his premium plus any commissions and fees.

**The First Step: Calculate the Break–Even Price**

Before purchasing any option, it's essential to precisely determine what the underlying futures price must be in order for the option to be profitable at expiration. The calculation isn't difficult. All you need to know to figure a given option's break-even price is the following:

- The option's strike price;

- The premium cost; and

- Commission and other transaction costs.

*Determining the break-even price for a call option*

There are two ways to calculate the "break-even" of an option. The first is to calculate the break-even of an option which will simply be liquidated (the more common event). This break-even is expressed in terms of the option's premium.

For example, assume a call option on an August soybean futures contract is purchased at 20¢ ($1,000), the commission and transaction costs equals $100.00 or 2¢. The break-even price of the option premium is 22¢. If the market price of soybean futures moves up enough for the premium of the option to exceed 22¢, the option can be sold for a profit—even if the option is still out-of-the-money.

Under this method of calculation, one must consider the change in the option premium relative to the underlying futures contract (delta) when applying expectations of the futures market price movement to option premiums. Certainly, with the ease of which either method can be calculated, a trader is well advised to calculate both break-even points (options premium and underlying futures price) *before* placing any options trade.

The second break-even calculation involves expressing the break-even price in terms of the underlying futures contract—as if the option will be exercised (however, most options are offset, not exercised). This method of break-even calculation only considers the intrinsic value of the option premium and is best applied to at-the-money or in-the-money options.

Example: It's January and the 1,000 barrel April crude oil futures contract is currently trading at around $12.50 a barrel. Expecting a potentially significant increase in the futures price over the next several months, you decide to buy an April crude oil call option with a strike price of $13. Assume the premium for the option is 95¢ a barrel and that the commission and other transaction costs are $50, which amounts to 5¢ a barrel.

| Option Strike Price | | Option Premium | | Commissions and Transaction Costs | | Break–Even Price |
|---|---|---|---|---|---|---|
| $13.00 | + | 95¢ | + | 5¢ | = | $14.00 |

Before trading, you need to know how much the April crude oil futures price must increase by expiration in order for the option to break-even or yield a net profit after expenses. The answer is that the futures price must increase to $14 for

you to break even and to above $14 for you to realize any profit. The option will exactly break even if the April crude oil futures price at expiration is $14 a barrel. For each $1 a barrel the price is above $14, the option will yield a profit of $1,000. If the futures price at expiration is $14 or less, there will be a loss. But in no event can the loss exceed the $1,000 total of the premium, commission and transaction costs.

### Determining the break-even price for a put option

The arithmetic is the same as for a call option except that instead of adding the premium, commission and transaction costs to the strike price, you subtract them.

Example: The price of gold is currently about $ 300 an ounce, but during the next few months you think there may be a sharp decline. To profit from the price decrease if you are right, you consider buying a put option with a strike price of $295 an ounce. The option would give you the right to sell a specified gold futures contract at $295 an ounce at any time prior to the expiration of the option.

Assume the premium for the put option is $3.70 an ounce ($370 in total) and the commission and transaction costs are $50 (equal to 50¢ an ounce). For the option to break even at expiration, the futures price must decline to $290.80 an ounce or lower.

| Option Strike Price | - | Option Premium | - | Commissions and Transaction Costs | = | Break-Even Price |
|---|---|---|---|---|---|---|
| $295 | - | $3.70 | - | 50¢ | = | $290.80 |

The option will exactly break even at expiration if the futures price is $290.80 an ounce. For each $1 an ounce the futures price is below $290.80 it will yield a profit of $100. If the futures price at expiration is above $290.80, there will be a loss. But in no case can the loss exceed $420—the

sum of the premium ($370) plus commission and other transaction costs ($50).

### Factors Affecting the Choice of an Option

If you expect a price increase, you'll want to consider the purchase of a call option. If you expect a price decline, you'll want to consider the purchase of a put option. However, in addition to price expectations, there are two other factors that affect the choice of option:

- The length of the option; and
- The option strike price

### The length of the option

One of the attractive features of options is that they allow time for your price expectations to be realized. The more time you allow, the greater the likelihood the option will eventually become profitable. This could influence your decision about whether to buy, for example, an option on a March futures contract or an option on a June futures contract. Bear in mind that the length of an option (such as whether it has three months to expiration or six months) is an important variable affecting the cost of the option. The longer the time duration an option has, the more it commands a higher premium.

### The option strike price

The relationship between the strike price of an option and the current price of the underlying futures contract is, along with the length of the option, a major factor affecting the option premium. At any given time, there may be trading in options with a half dozen or more strike prices—some of them below the current price of the underlying futures contract and some of them above.

A call option with a low strike price will have a higher premium cost than a call option with a high strike price because it will more likely and more quickly become

worthwhile to exercise. For example, the right to buy a crude oil futures contract at $11 a barrel is more valuable than the right to buy a crude oil futures contract at $12 a barrel.

Conversely, a put option with a high exercise price will have a higher premium cost than a put option with a low exercise price. For example, the right to sell a crude oil futures contract at $12 a barrel is more valuable than the right to sell a crude oil futures contract at $11 a barrel.

While the choice of a call option or put option will be dictated by your price expectations, and your choice of expiration month by when you look for the expected price change to occur, the choice of strike price is somewhat more complex. That's because the strike price will influence not only the option's premium cost but also how the value of the option, once purchased, is likely to respond to subsequent changes in the underlying futures contract price. Specifically, options that are out-of-the-money do not normally respond to changes in the underlying futures price the same as options that are at-the-money or in-the-money.

Generally speaking, premiums for out-of-the-money options do not reflect, on a dollar for dollar basis, changes in the underlying futures price (delta). The change in option value is usually less. Indeed, a change in the underlying futures price could have little effect, or even no effect at all, on the value of the option. This could be the case if, for instance, the option remains deeply out-of-the-money after the price change or if expiration is near.

If you purchase an out-of-the-money option, bear in mind that no matter how much the futures price moves in your favor, the option will still expire worthless, and you will lose the entire premium paid unless the option is in-the-money at the time of expiration. To realize a profit, it must be in-the-money by some amount greater than the option's purchase costs. This is why it's crucial to calculate an option's break-even price *before* you buy it.

Example: At a time when the March crude oil futures price is $11 a barrel, a trader expecting a substantial price increase buys a March call option with a strike price of $12.50. By expiration, as expected, there has been a substantial price increase to $12.50. But since the option is still not worthwhile to exercise, it expires worthless and the trader has lost the total premium paid.

## After You Buy an Option, What Then?

At any time prior to the expiration of an option, you can:

- Offset the option.
- Continue to hold the option.
- Exercise the option.

### Offsetting the option

Liquidating an option in the same marketplace where it was bought is the most frequent method of realizing option profits (*exercising* an option before expiration date will cause the loss of any time value embedded in the premium of the option). Liquidating an option prior to its expiration for whatever value it may still have is also a way to reduce your loss (by recovering a portion of the amount you paid for the premium of the option) in case the futures price hasn't performed as you expected it would, or if the price outlook has changed.

In active markets, there are usually other traders who are willing to pay for the rights your option conveys. How much they are willing to pay (it may be more or less than you paid) will depend on (1) the current futures price in relation to the option's strike price. (2) the length of time still remaining until expiration of the option, and (3) market volatility. Net profit

or loss, after allowance for commission charges and other transaction costs, will be the difference between the premium you paid to buy the option and the premium you receive when you liquidate the option.

Example: In anticipation of rising sugar prices, you bought a call option on a sugar futures contract. The premium cost was $950 and the commission and transaction costs were $50. Sugar prices have subsequently risen and the option now commands a premium of $1,250. By liquidating the option at this price, your net gain is $250. That's the selling price of $1,250 minus the $950 premium paid for the option minus $50 in commission and transaction costs.

| | |
|---|---|
| Premium paid for option .................. | $ 950 |
| Premium received when option is liquidated | $1,250 |
| Increase in premium ..................... | $ 300 |
| Less transaction costs ................... | $ 50 |
| Net profit............................. | $ 250 |

You should be aware, however, that there is no guarantee that there will actually be an active market for the option at the time you decide you want to liquidate. If an option is too far removed from being worthwhile to exercise or if there is too little time remaining until expiration, there may not be a market for the option at any price.

Assuming, though, that there's still an active market, the price you get when you liquidate will depend on the option's premium at that time. Premiums are arrived at through open competition between buyers and sellers according to the rules of an exchange.

### Continuing to hold the option

The second alternative you have after you buy an option is to hold an option right up to the final date for exercising or liquidating it. This means that even if the price change you've anticipated doesn't occur as soon as you expected—or even if the price initially moves in the opposite direction—you can continue to hold the option if you still believe the market will prove you right. If you are wrong, you will have lost the opportunity to limit your losses through offset. On the other hand, the most you can lose by continuing to hold the option is the sum of the premium and transaction costs. This is why it is sometimes said that option buyers have the advantage of staying power. You should be aware, however, options decline in value as they approach expiration. (See "Time Value.").

### Exercising the option

You can also exercise the option at any time prior to the expiration of the option. It does not have to be held until expiration. It is essential to understand, however, that exercising an option on a futures contract means that you will acquire either a long or short position in the underlying futures contracts long futures position if you exercise a call and a short futures position if you exercise a put.

Example: You've bought a call option with a strike price of 70¢ a pound on a 40,000 pound live cattle futures contract. The futures price has risen to 75¢ a pound. Were you to exercise the option, you would acquire a long cattle futures position at 70¢ with a "paper gain" of 5¢ a pound ($2,000). And if the futures price were to continue to climb, so would your gain.

However, there are both costs and significant risks involved in acquiring a position in the futures market. For one thing, the broker will require a margin deposit to provide protection against possible fluctuations in the futures price. And if the futures price moves adversely to your position, you could be called upon—perhaps even within hours—to make additional margin deposits. There is no upper limit to the extent of these margin calls. Generally, margin calls must be met immediately, which can mean the necessity of

large cash sums available for quick transfer into your futures account.

Secondly, unlike an option which has limited risk, a futures position has potentially unlimited risk. The further the futures price moves against your position, the larger your loss. Even if you were to exercise an option with the intention of promptly liquidating the futures position acquired through exercise, there's the risk that the futures price which existed at the moment may no longer be available by the time you are able to liquidate the futures position. Futures prices can and often do change rapidly.

Thirdly, as discussed earlier, there are two components to the value of an option premium: the time value and the intrinsic value. The exercise of an option into a futures contract captures only the intrinsic value, the time value is lost. Therefore, very few options are ever exercised and even then generally only at expiration. Options exercisable before expiration are known as American style options, options exercisable at expiration are known as European style options.

For all these reasons, only a small percentage of option buyers elect to realize option trading profits by exercising an option. Most choose the alternative of having the broker offset, i.e., liquidate—the option at its currently quoted premium value.

## Who Writes Options and Why?

Up to now, this booklet has discussed only the buying of options. But it stands to reason that when someone buys an option, someone else sells it. In any given transaction, the seller may be someone who previously bought an option and is now liquidating it. Or the seller may be an individual who is participating in the type of trading activity known as option writing.

The attraction of option writing to some traders is the opportunity to receive the premium that the option buyer pays. An option buyer anticipates that a change in the option's underlying futures price at some point in time prior to expiration will make the option worthwhile to exercise. An option writer, on the other hand, anticipates that such a price change won't occur—in which event the option will expire worthless and he will retain the entire amount of the option premium that was received for writing the option.

Example: At a lime when the March U.S. Treasury Bond futures price is 125-00, a trader expecting stable or lower futures prices (meaning stable or higher interest rates) earns a premium of $400 by writing a call option with a strike price of 129. If the futures price at expiration is below 129-00, the call will expire worthless and the option writer will retain the entire $400 premium. His profit will be that amount less the transaction costs.

While option writing can be a profitable activity, it is also an extremely high risk activity. In fact, an option writer has an unlimited risk. Except for the premium received for writing the option, the writer of an option stands to lose any amount the option is in-the-money at the time of expiration (unless he has liquidated his option position in the meantime by making an offsetting purchase). In the previous example, a trader earned a premium of $400 by writing a U.S. Treasury Bond call option with a strike price of 129. If, by expiration, the futures price has climbed above the option strike price by more than the $400 premium received, the trader will incur a loss. For instance, if the futures price at expiration has risen to 131-00, the loss will be $1,600. That's the $2,000 the option is in-the-money less the $400 premium received for writing the option.

As you can see from this example, option writers as well as option buyers need to calculate a break-even price. For the writer of a call, the break-even price is the option strike price plus the net premium received after transaction costs. For the writer of a put, the break-even price is the option strike price minus the premium received after transaction costs. An option writer's potential profit is limited to the amount of the premium less transaction costs. The option writer's potential losses are unlimited. And an option writer may need to deposit funds necessary to cover losses as often as daily.

### Risk Caution

In considering whether to trade in high risk futures and options where there exists a substantial degree of price volatility and financial leverage, you should understand and seriously consider the many real risk factors which you are certain to encounter. Trading in futures and options involves an extremely high degree of risk of loss. Investors can and do lose all or part of the money they deposit. Because of the volatile nature of futures and options, the market price and, consequently, the value of your account can rise and fall sharply without notice.

The use of leverage generally causes the value of your market position to change at a greater rate than that of the underlying asset, substantially increasing the risk of loss. As the result of an adverse price movement (or other factors) you may sustain a total loss of your initial deposit (including commissions paid) and any additional funds that you deposit. You may also be subject to losses that exceed the amount deposited in your account when trading in futures and short (opening sell) options.

Option trading is a zero-sum game; for every dollar of profit there is an equal dollar of loss. Some studies have shown that more than eighty-five percent of small investors who trade options ultimately lose money. An option is an extremely complicated trading vehicle, which carries substantial risks that are not inherent to the trading of the underlying asset. For example, options lose value with the passage of time (time-decay); options are generally not fully responsive to the price movement of the underlying asset (delta). Option profitability is substantially dependent on the exercise (strike) price of the option relative to the underlying market price.

Long (opening buy) options have risk that is limited to the amount of the option premium plus the commission, however, short (opening sell) options have unlimited risk. An option with a strike price that is deep out-of-the-money has only a remote chance of ever becoming profitable. You should familiarize yourself with the specific and systematic risks, terminology, and workings of long and short, call and put options before depositing money for options trading.

Option writing as a trading strategy is absolutely inappropriate for anyone who does not fully understand the nature and the extent of the risks involved and who cannot afford the possibility of a potentially unlimited loss. It is also possible in a market where prices are changing rapidly that an option writer may have no ability to control the extent of his losses. Option writers should be sure to read and thoroughly understand the Risk Disclosure Statement that is provided to them.

This brief section cannot identify all of the risks and other significant aspects involved in trading in futures and options. You should, therefore, carefully study and understand the CFTC required Risk Disclosure Statement and all aspects of the account, the market, and the trading vehicle, prior to depositing any money for trad-

ing. If you do not understand any part of the Risk Disclosure Statement, seek the advice of a qualified attorney or trained financial advisor.

### Part Four: A Pre–Investment Checklist

√ Take the time to check out any firm or individual that you don't know through previous experience or reputation. All firms and persons offering options on U.S. futures contracts are required by law to be registered with the Commodity Futures Trading Commission (CFTC) and to be Members of National Futures Association (NFA). You can do this quickly, easily and without cost by accessing NFA's Background Affiliation Status Information Center (BASIC), located at NFA's web sile (www.nfa.futures.org). BASIC will provide you with the firm and/or individual's registration status as well as any disciplinary actions taken by NFA, the CFTC or any U.S. exchanges. This same information is available by calling NFA toll-free at 800–621–3570.

√ Understand what a firm's commission charges will be and how they're calculated. If the charges seem high, either on a dollar basis or as a percentage of the option premium you might want to seek comparison quotes from one or two other firms. If a firm seeks to justify an unusually high commission charge on the basis of its services or performance record, you might want to ask for a detailed explanation or documentation in writing.

√ Calculate exactly the break-even price for any option you are considering buying or writing. You should know the specific futures price above or below which the option, at expiration, will be profitable.

√ Read and fully understand the required Risk Disclosure Statement before making any commitment to purchase or write an option.

√ Learn enough about the commodity you would be trading in to have a reasonable expectation that the necessary price change will occur prior to the expiration of the option. Be certain you understand the risks inherent in acquiring a futures position through the exercise of an option.

√ Don't purchase an option unless you understand that you could lose your entire investment. Don't write an option unless you understand that option writing involves potentially unlimited losses. And don't make any investment commitment unless the money you could potentially lose can legitimately be regarded as risk capital.

√ Don't make any trade on the basis of high-pressure sales tactics. Reputable firms don't operate that way. It's far better to miss out on a trading opportunity than to be rushed into a decision you may later regret. And don't make a trade that is presented to you as a sure thing. They don't exist.

√ Always seek the advice of other persons such as a knowledgeable financial advisor, attorney or accountant before making any major investment decision.

### Recommended Reading

*The Complete Guide to Futures Trading*

Jack Schwager, Harper Business

*Option as a Strategic Investment*

Lawrence McMillan, New York Institute of Finance

*Option Volatility and Pricing Strategies*

Sheldon Natenburg, Probus Publishing Co.

*Market Wizards*

Jack Schwager, Harper Business

*Risk, Uncertainty and Profit*

Frank H. Knight, McMillan Publishing Co.

*The Remarkable History of Risk*

Peter L. Bernstein, John Wiley & Sons, Inc.

*Portfolio Selection & Efficient Diversification of Investments*

H. Markowitz, Baldwin Publishing

Applied Research, Inc, Chicago, IL. http://www.appliedresearch.com

Montgomery Investment Technologies, Inc., Reading, PA., http://www.miti.com

### NFA Information and Resources

Information Center:

800.621.3570

World Wide Web:

http://www.nfa.futures.org

NFA's web site offers information regarding the Association's history and organizational structure. NFA Members also will find the current issues of the Member newsletter and Activity Report, Notices to Members and rule interpretations. The investing public can download publications to help them understand the commodity futures industry as well as their rights and responsibilities as market participants. All visitors to NFA's web site can ask questions, make comments and order publications via e-mail.

BASIC: http://www.nfa.futures.org/basic/about.asp. Anyone with access to the Internet is able to perform online background checks on the firms and individuals involved in the futures industry by using NFA's Background Affiliation Status Information Center (BASIC). NFA, the CFTC and the U.S. futures exchanges have supplied BASIC with information on CFTC registration, NFA membership, futures-related disciplinary history and non-disciplinary activities such as CFTC reparations and NFA arbitration.

Organizations and Agencies Referenced:

Commodity Futures Trading Commission

Three Lafayette Centre

1155 21st Street, NW Washington, DC 20581

202.418.5080

http://www.cftc.gov

*Buying Options on Futures Contracts: A Guide to Uses and Risks* was prepared as a service to the investing public by: National Futures Association, 200 West Madison St., Ste. 1600, Chicago, IL 60606–3447 800.621.3570 http://www.nfa.futures.org

### About Risk Capital Trading Group

Risk Capital Trading Group, Inc. (RCTG) is a Guaranteed Introducing Broker of National Commodities Corporation Inc.; and is registered with the Commodity Futures Trading Commission and a member of the National Futures Association. RCTG's futures and options brokerage focuses largely in the inter-related financial markets: stock indices, interest rates, currencies, precious metals and energies.

RCTG would like to acknowledge and thank the National Futures Association. This booklet has in large part been adapted from the NFA's *Buying Options on Futures Contracts: A Guide to Uses and Risks,* which NFA produced as a service to the investing public. It has been modified by RCTG and is provided here as a courtesy to its clients.

**Account Forms**

# National Commodities Corp., Inc.

RCTG01671

## RISK DISCLOSURE STATEMENT FOR FUTURES AND OPTIONS

*This brief statement does not disclose all of the risks and other significant aspects of trading in futures and options. In light of the risks, you should undertake the transactions only if you understand the nature of the contracts (and contractual relationships) into which you are entering and the extent of your exposure to risk Trading in futures and options is not suitable for many members of the public. You should carefully consider whether trading is appropriate for you in light of your experience, objectives, financial resources and other relevant circumstances.*

### Futures

1. Effect of "Leverage" or "Gearing"

Transactions in futures carry a high degree of risk. The amount of initial margin is small relative to the value of the futures contract so that transactions are "leveraged" of "geared". A relatively small market movement will have a proportionately larger impact on the funds you have deposited or will have to deposit: this may work against you as well as for you. You may sustain a total loss of initial margin funds and any additional funds deposited with the firm to maintain your position. If the market moves against your position or margin levels are increased, you may be called upon to pay substantial additional funds on short notice to maintain your position. If you fall to comply with a request for additional funds within the time prescribed, your position may be liquidated at a loss and you will be liable for any resulting deficit.

2. Risk-reducing orders or strategies

The placing of certain orders (e.g. "stop-loss" orders, where permitted under local law, or "stop-limit" orders) which are intended to limit losses to certain amounts may not be effective because market conditions may make it impossible to execute such orders. Strategies using combinations of positions, such as "spread" and "straddle" positions may be as risky as taking simple "long" or "short" positions.

### Options

3. Variable degree of risk

Transactions in options carry a high degree of risk. Purchasers and sellers of options should familiarize themselves with the type of option (i.e. put or call) which they contemplate trading and the associated risks. You should calculate the extent to which the value of the options must increase for your positions to become profitable, taking into account the premium and all transaction costs.

The purchaser of options may offset or exercise the options or allow the options to expire. The exercise of an option results either in a cash settlement or in the purchaser acquiring or delivering the underlying interest. If the option is on a future, the purchaser will acquire a futures position with associated liabilities for margin (see the section on Futures above). If the purchased options expire worthless, you will suffer a total loss of your investment which will consist of the option premium plus transaction costs. If you are contemplating purchasing deep-out-of-the-money options, you should be aware that the chance of such options becoming profitable ordinarily is remote.

Selling ("writing" or "granting") an option generally entails considerably greater risk than purchasing options. Although the premium received by the seller is fixed, the seller may sustain a loss well in excess of that amount. The seller will be liable for additional margin to maintain the position if the market moves unfavorably. The seller will also be exposed to the risk of the purchaser exercising the option and

the seller will be obligated to either settle the option in cash or to acquire to deliver the underlying interest. If the option is on a future, the seller will acquire a position in a future with associated liabilities for margin (see the section on Futures above). If the option is 'covered' by the seller holding a corresponding position in the underlying interest or a future or another option, the risk may be reduced. If the option is not covered, the risk of loss can be unlimited.

Certain exchanges in some jurisdictions permit deferred payment of the option premium, exposing the purchaser to liability for margin payments not exceeding the amount of the premium. The purchaser is still subject to the risk of losing the premium and transaction costs. When the option is exercised or expires, the purchaser is responsible for any unpaid premium outstanding at the time.

Additional risks common to futures and options.

4. Terms and conditions of contracts

You should ask the firm with which you deal about the terms and conditions of the specific futures or options which you are trading and associated obligations (e.g. the circumstances under which you may become obligated to make or take delivery of the underlying interest of a future contract and, in respect of options, expiration dates and restrictions on the time for exercise). Under certain circumstances the specifications of outstanding contracts (including the exercise price of an option) may be modified by the exchange or clearing house to reflect changes in the underlying interest.

5. Suspension or restriction of trading and pricing relationships

Market conditions (e.g.illiquidity) and/or the operation of the rules of certain markets (e.g. the suspension of trading in any contract or contract month because of price limits or "circuit breakers") may increase the risk of loss by making it difficult or impossible to affect transactions or liquidate/offset positions. If you have sold options, this may increase the risk of loss.

Further, normal pricing relationships between the underlying interest and the future, and the underlying interest and the option may not exist. This can occur when, for example, the futures contract underlying the option is subject to price limits while the option is not. The absence of an underlying reference price may make it difficult to judge "fair" value.

6. Deposited cash and property

You should familiarize yourself with the protections accorded money or other property you deposit for domestic and foreign transactions, particularly in the event of a firm insolvency or bankruptcy. The extent to which you may recover your money or property may be governed by specific legislation or local rules. In some jurisdictions, property which had been specifically identifiable as you own will be pro-rated in the same manner as cash for purposes of distribution in the event of a shortfall.

7. Commission and other charges

Before you begin to trade, you should obtain a clear explanation of all commission fees and other charges for which you will be liable. These charges will affect your net profit (if any) or increase your loss.

8. Transactions in other jurisdictions

Transactions on markets in other jurisdictions, including markets formally linked to a domestic market may expose you to additional risk. Such markets may be subject to regulation which may offer different or diminished investor protection. Before you trade you should enquire about any rules relevant to your particular transactions. Your local regulatory authority

will be unable to compel the enforcement of the rules of regulatory authority will be unable to compel the enforcement of the rules or regulatory authorities or markets in other jurisdictions where your transactions have been effected. You should ask the firm with which you deal for details about the types of redress available in both your home jurisdiction and other relevant jurisdictions before you start to trade.

9. Currency risks

The profit or loss in transactions in foreign currency-denominated contracts (whether they are traded in your own or another jurisdiction) will be affected by fluctuations in currency rates where there is a need to convert from the currency denomination of the contract to another currency.

10. Trading facilities

Most open-outcry and electronic trading facilities are supported by computer-based component systems for the order-routing, execution, matching registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption of failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms. Such limits may vary; you should ask the firm with which you deal for details in this respect.

11. Electronic trading

Trading on an electronic trading system may differ not only from trading in an open-outcry market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all.

12. Off-exchange transactions

In some jurisdictions, and only then in restricted circumstances, firms are permitted to effect off-exchange transactions. The firm with which you deal may be acting as your counterparty to the transaction. It may be difficult or impossible to liquidate an existing position, to assess the exposure to risk. For these reasons, these transactions may involve increased risks. Off-exchange transactions may be less regulated or subject to a separate regulatory regime. Before you undertake such transactions, you should familiarize yourself with applicable rules and attendant risks.

I hereby acknowledge that I have received and understood this risk disclosure statement.

| Date | Signature of Customer |
|------|----------------------|

| Date | Signature of Customer |
|------|----------------------|